**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD MISLE,<br><br>Plaintiff,<br><br>v.<br><br>SCHNITZER STEEL INDUSTRIES, INC.,<br><br>Defendant. | Case No. 15-cv-06031-JSW<br><br>**ORDER RESERVING IN PART AND DENYING, IN PART, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 60 |

Now before the Court for consideration is the motion for summary judgment filed by

Plaintiff Howard Misle ("Misle"). The Court has considered the parties' papers, relevant legal

authority, the record in this case, and it has had the benefit of oral argument on the issue of the

litigation privilege. For the reasons set forth in this Order, the Court RESERVES RULING, IN

PART, AND DENIES, IN PART, Misle's motion.

**BACKGROUND**

It is undisputed that Misle, other entities not parties to this lawsuit, and Defendant

Schnitzer Steel Industries, Inc. ("SSI") entered into an Asset Purchase Agreement (the "APA")

dated April 6, 2011.[1]  It also is undisputed that the transaction closed on April 21, 2011 (the

"Closing Date"). Pursuant to the APA, SSI agreed, for a sum certain, to purchase "all of the assets

---

[1]     The other entities are American Metal Group, Inc., American Metal & Iron, Inc., AMI
Recycling, Inc., AMI Recycling Drive-Thru, Inc., Dimond Metal Recycling, Inc., A-1
International Recycling Consultants, Inc., Metal Brokers Recycling, Inc., L&M Auto Dismantling,
Company, Inc., and HNM Properties, Inc.  These entities are referred to throughout the APA as
the "Selling Parties."  Misle is referred to as the "Selling Party Representative."

United States District Court
Northern District of California

1   of the Selling Parties used or held for use in, relating to or arising out of the Business[2], subject to

2   the exclusions and on the terms set forth" in the APA.[3]  (Dkt. No. 60-1, Declaration of Howard

3   Misle ("Misle Decl."), ¶ 5, Ex. A, APA, Recitals, ¶ C.)

4        The parties agreed that a portion of the total purchase price, $5,500,000.00 (the "Escrow

5   Funds" or "Escrow Amount"), would be placed in escrow and held by Wells Fargo Bank, N.A. as

6   escrow agent.[4]  (APA, Art. IV, § 4.2(c).)  The APA states that the Escrow Funds are "to serve as a

7   source of indemnification for the matters addressed in Article IX and to be held and released under

8   the terms of the Escrow Agreement."  (*Id.*)

9           Pursuant to the terms of the Escrow Agreement and this Agreement,
        the Escrow Amount will be divided into two parts as follows: (i)

10          $4,500,000 of the Escrow Amount will be used for indemnification
        matters addressed in Section 9.2, with $2,250,000 of such portion of

11          the Escrow Amount (less any paid or pending claims) to be
        disbursed to the Selling Parties on the first anniversary of the

12          Closing Date and the remaining balance of such portion of the
        Escrow Amount to be disbursed to the Selling Parties on the second

13          anniversary of the Closing Date (less any paid or pending claims);
        and (ii) $1,000,000 of the Escrow Amount will be used for

14          indemnification matters addressed in Section 9.7 and held until the
        fifth anniversary of the Closing Date[.][5]

15

16  (APA, Art. IV, § 4.2(c).)

17       The APA also states that "[a]ny Party seeking indemnification shall promptly notify the

18  Party obligated to provide indemnification hereunder of any Loss or Losses, claim or breach,

19  including any claim by a third party, that might give rise to indemnification hereunder, and the

20  Indemnified Party shall deliver to the Indemnifying Party a … Claim Certificate."  (APA, Art. IX,

21  § 9.5(a).)

22

---

23  [2]     "Business" is defined as the Selling Parties' "business of collecting, processing,

24  transporting and selling ferrous and non-ferrous scrap metal, glass, plastics and cardboard and
other aspects of metals recycling and other materials recycling."  (APA, Recitals, ¶ A.)

25  [3]     The total purchase price is not material to this motion.

26  [4]     The APA refers to the $5,500,000.00 as the "Escrow Amount."  The Court shall use that

27  term when it is quoting from the APA.  Otherwise, it shall use the term "Escrow Funds."

28  [5]     There are other provisos set forth in Section 4.2(c), which are not at issue in this lawsuit.

United States District Court
Northern District of California

> If the Indemnifying Party objects to the indemnification of an Indemnified Party in respect of any claim or claims specified in any Claim Certificate, the Indemnifying Party shall deliver a written notice to such effect to the Indemnified Party within 30 days after receipt by the Indemnifying Party of such Claim Certificate. Thereafter the Indemnifying Party and the Indemnified Party shall attempt in good faith to agree upon the rights of the respective parties within 30 days of receipt of such Claim Certificate with respect to each of such claims to which the Indemnifying Party has objected.  If the Indemnified Party and the Indemnifying Party agree with respect to any of such claims, the Indemnified Party and the Indemnifying Party shall promptly prepare and sign a memorandum setting forth such agreement and, if applicable an instruction to the Escrow Agent.  Should the Indemnified Party and the Indemnifying Party fail to agree as to any particular item or items or amount or amounts, then the Indemnified Party shall be entitled to pursue its available remedies for resolving its claim for indemnification.

(APA, Art. IX, § 9.5(a)(ii).)

Misle and SSI executed the Escrow Agreement on April 20, 2011.  (Misle Decl., ¶ 8, Ex. D, Escrow Agreement at 1.)  The Escrow Agreement contains provisions that set forth the procedures for disbursement of the Escrow Funds.  (Escrow Agreement, Art. I, § 1.3(d)-(f).)  The parties agreed that disbursements could be made by joint or unilateral instructions.  (Escrow Agreement, Art. I, § 1.3(a).)

> In the event the Escrow Agent receives Unilateral Instructions and a related Proof of Notice from the Buyer, the Escrow Agent shall pay the Escrow [Funds] to the account or accounts described in such Unilateral Instructions on the thirtieth day after receipt of such Unilateral Instructions, unless, before the thirtieth day after the date of receipt of such Unilateral Instructions, the Escrow Agent has received a Notice of Dispute and a related Proof of Notice from Misle.  In the event the Escrow Agent receives such a Notice of Dispute, the Escrow Agent shall not pay the amount described in such Unilateral Instructions, but shall proceed as set forth in Section 3.5.

(Escrow Agreement, Art. I, § 1.3(c).)

In December 2014, SSI sent Misle a Claim Certificate and served Unilateral Instructions on Wells Fargo seeking indemnification in the amount of $86,604.60 ("December Claim").  (Misle Decl., ¶ 12, Ex. E.)  Misle claims that he served a written objection to the claim on SSI.  (Compl. ¶ 10; Misle Decl. ¶ 13 (attesting "on information and belief, my counsel at the time I received the [December Claim] served an objection thereto").)  It is undisputed, however, that

3

1    Misle did not serve a Notice of Dispute on Wells Fargo.  As a result, Wells Fargo distributed those

2    funds to SSI.

3         In August 2015 and April 2016 SSI sent Misle two additional Claim Certificates and

4    served Unilateral Instructions on Wells Fargo.  (Misle Decl., ¶ 12, Ex. E.)  It is undisputed that

5    Misle did serve a Notice of Dispute as to each of those Claim Certificates on Wells Fargo.  This

6    litigation ensued.  Misle asserts claims against SSI for breach of contract, declaratory relief, and

7    conversion.[6]  SSI counterclaims for breach of contract, equitable indemnity, and declaratory relief.

8         The Court will address additional facts as necessary in its analysis.

9                                    **ANALYSIS**

10        Misle moves for partial summary judgment on his declaratory relief claim and partial

11   summary judgment on his breach of contract claim.  Misle also moves for summary judgment on

12   SSI's breach of contract claim.  With respect to the latter claim, Misle argues, in part, that it is

13   barred by California Civil Code section 47(b) (the "litigation privilege").  At the hearing, the

14   parties stated that a ruling on this issue would assist settlement efforts.  Accordingly, for the

15   reasons set forth in the remainder of this Order, the Court DENIES, IN PART, Misle's motion and

16   concludes that the litigation privilege does not bar SSI's breach of contract counterclaim.  The

17   Court reserves ruling on the remaining arguments pending the outcome of the parties' settlement

18   conference.

19   **A.    Legal Standards Applicable to Motion for Summary Judgment and Adjudication.**

20        "A party may move for summary judgment, identifying each claim or defense … on which

21   summary judgment is sought."  Fed. R. Civ. P. 56(a).  A principal purpose of the summary

22   judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v.*

23   *Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment, or partial summary judgment, is

24   proper "if the movant shows that there is no genuine dispute as to any material fact and the movant

25   is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In considering a motion for

26   summary judgment, the court may not weigh the evidence or make credibility determinations, and

27   _____

28   [6]    SSI has moved for summary judgment on Misle's conversion claim.  The Court will
     resolve that motion by a separate order.

United States District Court
Northern District of California

1    is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v.*

2    *Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *abrogated on other grounds by Shakur v. Schriro*, 514

3    F.3d 878, 884-85 (9th Cir. 2008).

4         The party moving for summary judgment bears the initial burden of identifying those

5    portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue

6    of material fact.  *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c).  An issue of fact is

7    "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-

8    moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material"

9    if it may affect the outcome of the case.  *Id.* at 248.  If the party moving for summary judgment

10   does not have the ultimate burden of persuasion at trial, that party must produce evidence which

11   either negates an essential element of the non-moving party's claims or that party must show that

12   the non-moving party does not have enough evidence of an essential element to carry its ultimate

13   burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

14   (9th Cir. 2000).

15        Once the moving party meets its initial burden, the non-moving party must "identify with

16   reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91

17   F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th

18   Cir. 1995).  It is not the Court's task "to scour the record in search of a genuine issue of triable

19   fact."  *Id.*; *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but

20   it may consider other materials in the record.").  If the non-moving party fails to point to evidence

21   precluding summary judgment, the moving party is entitled to judgment as a matter of law.

22   *Celotex*, 477 U.S. at 323.

23   **B.    The Litigation Privilege Does Not Bar SSI's Breach of Contract Counterclaim.**

24        Misle argues that SSI's breach of contract claim is barred by the litigation privilege,

25   because the claim based on the fact that Misle filed this suit against SSI.  As set forth in California

26   Civil Code section 47, "[a] privileged publication or broadcast is one made: … (b) [i]n any … (2)

27   judicial proceeding[.]"  Thus, the privilege will apply "to any communication (1) made in judicial

28   or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1    achieve the objects of the litigation; and (4) that have some connection or logical relation to the

2    action." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990).  The privilege is "'not limited to

3    statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or

4    afterwards.'" *McNair v. City and County of San Francisco*, 5 Cal. App. 5th 1154, 1162 (2016)

5    (quoting *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006)).

6           Although the litigation privilege generally is invoked to preclude a tort claim, in some

7    circumstances it may preclude a breach of contract claim.  *See, e.g., McNair*, 5 Cal. App. 4th at

8    1169.  In order to determine whether to apply the litigation privilege in a breach of contract case, a

9    court looks to "whether its application furthers the policies underlying the privilege," which have

10   been described as "ensur[ing] free access to the courts, promot[ing] complete and truthful

11   testimony, encourag[ing] zealous advocacy, giv[ing] finality to judgments, and avoid[ing]

12   unending litigation." *Wentland v. Wass*, 126 Cal. App. 4th 1484, 1492 (2005).

13          Misle argues the facts of this case are similar to *Feldman v. 1100 Park Lane Associates*

14   *("Park Lane")*, 160 Cal. App. 4th 1467 (2008).  In that case, Park Lane filed an unlawful detainer

15   suit against the Feldmans, whom it contended did not have a valid sublease on an apartment.  The

16   Feldmans counterclaimed and argued that Park Lane breached the sublease by sending notices

17   challenging their tenancy and by "illegally evicting [them] from the premises, seeking thereby to

18   deprive [them] of their contractual rights to occupancy of the premises." *Id.* at 1473-74, 1494.

19   The court concluded that the breach of contract counterclaim was barred by the litigation

20   privilege.  The court reasoned that the "agreement alleged to have been breached was the

21   Addendum [to the master lease], the validity of which was at issue in the unlawful detainer action

22   itself.  In the court's view, the Feldmans claimed the *fact* that Park Lane pursued an unlawful

23   detainer action amounted to a breach of the sublease.  *Id.* at 1497.  Therefore, the court found the

24   Feldmans had not shown their claim "'was based on a breach of a separate promise independent of

25   the litigation.'" *Id.* (quoting *Wentland*, 126 Cal. App. 4th at 1494.)  The court also concluded that,

26   under those circumstances, application of the privilege furthered "the policy of allowing access to

27   the courts without fear of harassing derivative actions." *Id.*

28          In *Wentland*, by contrast, the court concluded the litigation privilege did not apply to bar a

6

1    breach of contract claim.  That case "arose out of several real estate investment partnerships

2    managed by" Wentland, which resulted in an action for an accounting in which Wentland was

3    named as a defendant.  126 Cal. App. 4th at 1487.  Wentland moved for summary judgment, and

4    in opposition the plaintiffs filed a declaration asserting Wentland had engaged in wrongdoing in

5    connection with other investments.  *Id.* at 1487, 1489.  Wentland filed a cross-complaint against

6    the plaintiffs and alleged the parties had entered into an agreement resolving the dispute about one

7    of those investments.  According to Wentland, as part of the resolution the plaintiffs agreed they

8    "would make no accusation or comment that alleged wrongdoing" by Wentland in connection

9    with that transaction.  *Id.* at 1487-88, 1489.  Wentland argued that plaintiff's statements in their

10    brief and in a declaration in opposition to the motion for summary judgment breached the non-

11    disparagement agreement.  *Id.*

12        The trial court sustained a demurrer to the cross-complaint on the basis that the claims

13    were barred by the litigation privilege, and the *Wentland* court reversed.

> Unlike in the usual derivative tort action, application of the privilege
> in the instant case does not serve to promote access to the courts,
> truthful testimony or zealous advocacy.  This cause of action is not
> based on allegedly wrongful conduct during litigation[.] … Rather
> it is based on a breach of separate promise independent of the
> litigation[.] … This breach is not simply a communication, but also
> wrongful conduct or performance under the contract[.] … Like the
> example of the covenant not to sue in [*Navellier v. Sletten*, 106 Cal.
> App. 4th 763 (2003)] … application of the privilege would frustrate
> the purpose of the [parties'] agreement.

20    *Id.* at 1494; *see also id.* at 1495 (concluding the cross-complaint sounded in contract, rather than

21    tort, because Wentland alleged the plaintiffs breached the agreement because they promised not to

22    make negative statements about Wentland and not because the comments were false).

23        The Court concludes that the facts in this case are more analogous to the facts in *Wentland*

24    than the facts in *Feldman*.  Contrary to Misle's argument, SSI does not argue the breach is the fact

25    that he filed this lawsuit.  Rather, it argues the breach is that he is attempting to recover funds to

26    which he is not legally entitled under the terms of the APA or the Escrow Agreement, because the

27    objections are improper and because Misle failed to follow the required procedures.  As in

28    *Wentland,* these *alleged* breaches are "not simply a communication, but also wrongful conduct or

United States District Court
Northern District of California

1  performance" under those agreements.[7]  For this reason, the Court also concludes that the policies

2  underlying the privilege would not served by application of the privilege in this case.

3        Accordingly, the Court DENIES, IN PART, Misle's motion for summary judgment on

4  SSI"s breach of contract claim.

5        **IT IS SO ORDERED.**

6  Dated: February 19, 2017

7  _____.

8      JEFFREY S. WHITE
    United States District Judge

---

[7]    The Court expresses no opinion on which party's interpretation of the relevant agreements is correct.

8