**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD MISLE,<br><br>    Plaintiff,<br><br>v.<br><br>SCHNITZER STEEL INDUSTRIES, INC.,<br><br>    Defendant. | Case No. 15-cv-06031-JSW<br><br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 60 |

Now before the Court for consideration is the motion for summary judgment filed by Plaintiff Howard Misle ("Misle"). Misle moves for summary judgment on his claims for declaratory relief and breach of contract against Defendant Schnitzer Steel Industries, Inc. ("SSI") and on SSI's counterclaim for breach of contract. On February 19, 2017, the Court issued an Order in which it held that the litigation privilege did not bar SSI's breach of contract claim. (Dkt. No. 77.) For the reasons set forth later in this Order, the Court shall revisit that ruling.

The Court reserved ruling on the remaining issues, pending the results of a settlement conference. The parties' efforts to resolve this matter were not successful. The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it determines that no further oral argument is necessary. For the reasons set forth herein, the Court GRANTS, IN PART, AND DENIES, IN PART, Misle's motion.

**BACKGROUND**

The following facts are undisputed unless otherwise noted. Misle, other entities not parties to this lawsuit, and SSI entered into an Asset Purchase Agreement (the "APA") dated April 6,

2011, pursuant to which SSI agreed, for a sum certain, to purchase certain assets from the Selling Parties.[1] The transaction closed on April 21, 2011 (the "Closing Date"). (*See* Dkt. No. 60-1, Declaration of Howard Misle ("Misle Decl."), ¶ 5, Ex. A (APA, Recitals, ¶ C).)

**A.     Relevant Provisions of the APA and the Escrow Agreement.**

The parties agreed to place $5,500,000.00 of the total purchase price in escrow ("Escrow Amount" or "Escrow Funds"), which was held by Wells Fargo Bank, N.A. as escrow agent. (APA, Art. IV, § 4.2(c).)[2] The parties defined the term "Escrow Amount" as "an *aggregate* amount of $5,500,000 of the Closing Date Purchase Price[.]" (*Id.* (emphasis added).) The parties also agreed that the Escrow Funds would be divided into two parts. The first part consisted of $4.5 million, which "will be used for indemnification matters addressed in Section 9.2." (*Id.*, § 4.2(c)(i).) The parties agreed that "$2,250,000 of such portion of the Escrow Amount (less any paid or pending claims) [would] be disbursed to the Selling Parties on the first anniversary of the Closing Date." (*Id.*) The Court refers to this portion of the Escrow Funds as the "Tranche I funds." "[T]he remaining balance of such portion of the Escrow Amount [would] be disbursed to the Selling Parties on the second anniversary of the Closing Date (less any paid or pending claims)[.]" (*Id.*) The Court refers to this portion of the Escrow Funds as the "Tranche II funds." The second part of the Escrow Amount consisted of $1 million, which "will be used for indemnification matters addressed in Section 9.7 and held until the fifth anniversary of the Closing Date[.]"[3] (*Id.*, § 4.2(c)(ii).)

The Escrow Agreement also contains provisions relating to how and when the Tranche I, Tranche II, and Tranche III funds would be distributed. On April 21, 2012, Wells Fargo would

---

[1] The total purchase price is not material to this motion. The "Selling Parties" are American Metal Group, Inc., American Metal & Iron, Inc., AMI Recycling, Inc., AMI Recycling Drive-Thru, Inc., Dimond Metal Recycling, Inc., A-1 International Recycling Consultants, Inc., Metal Brokers Recycling, Inc., L&M Auto Dismantling, Company, Inc., and HNM Properties, Inc. Misle is referred to in the APA as the "Selling Party Representative."

[2] The Court shall refer to the "Escrow Amount," as the "Escrow Funds," unless it is quoting the APA.

[3] There are other conditions set forth in Section 4.2(c), which are not at issue in this lawsuit.

release to Misle, "the amount, if positive, equal to the (i) the amount remaining in the" Escrow Funds on that date, "minus (ii) the sum of (A) $3,250,000 … plus" certain other items, including any unpaid distributions and Wells Fargo's fees and expenses. (Misle Decl., ¶ 8, Ex. D (Escrow Agreement, Art. I, § 1.3(d)).) On April 21, 2013, Wells Fargo would release to Misle "the amount, if positive, equal to (i) the amount remaining in" the Escrow Funds on that date, "minus (ii) the sum of (A) $1,000,000 … plus" certain other items, including any unpaid distributions and Wells Fargo's fees and expenses. (*Id.,* § 1.3(e).) Finally, on April 21, 2016, Wells Fargo would release the balance of the Escrow Funds, if positive, minus, *inter alia*, any unpaid distributions and Wells Fargo's fees. (*Id.*, § 1.3(f).)

Section 9.2 of the APA provides, in part, that:

> [t]he Selling Parties and Misle will, jointly and severally, indemnify, defend and hold harmless Buyer … from and with respect to any and all Losses related to or arising directly or indirectly out of any of the following: (c) any Excluded Liability (other than the Selling Parties' Retained Environmental Liabilities, if any, which are addressed in Section 9.7); … or (f) any of the items set forth on Schedule 9.2(f).

(APA, Art. IX, § 9.2.) Schedule 9.2(f) included a conditional use permit ("CUP") for certain property covered by the APA. (Misle Decl., ¶ 6, Ex. B (Schedule 9.2(f).)

Section 9.7 is entitled "Allocation of Environmental Liabilities" and states the Selling Parties would indemnify SSI for certain "Retained Environmental Liabilities." (APA, Art. IX, § 9.7(a)(i)-(iii). These Retained Environmental Liabilities "shall be indemnifiable without limitation or threshold, including any of the limitations set forth in Sections 9.4(a) and (b), but shall be subject to Sections 9.4(c)-(f)." (*Id.*, § 9.7(b).)

Section 9.4 is entitled "Limitations on Indemnification." It provides, in relevant part, that:

> [s]ubject to clauses (ii) and (iii) below, the Escrow Amount shall serve as the sole and exclusive source of funding for any Losses indemnifiable under Sections 9.2(a) or under Section 9.2(d) with respect to any Loss indemnifiable under Section 9.2(a), except, in each case, with respect to matters relating to Fundamental Representations.

(*Id.*, § 9.4(b)(i).)

3

> Except as otherwise provided in Section 9.7 with respect to Selling Parties' Retained Environmental Liabilities, the Excluded Liabilities and all items described on Schedule 9.2(f) shall be indemnifiable without limitation or threshold.

(*Id.*, § 9.4(b)(iii).)

> The Escrow Amount shall be available to reimburse Buyer and its Affiliates for any Losses for which they are entitled to be indemnified pursuant to Section 9.2 or 9.7, against which Buyer may proceed at its discretion, as well as, subject to Section 9.4(b), pursue any other remedy available to Buyer. If Buyer sends any Unilateral Instructions (as such term is defined in the Escrow Agreement) to the Escrow Agent, Buyer shall simultaneously send a copy of such Unilateral Instructions to the Selling Party Representative.

(*Id.*, § 9.4(e).)

Section 9.5 sets forth the procedures that a party seeking indemnification for any loss is required to follow. First, that party "shall promptly notify the Party obligated to provide indemnification hereunder of any Loss or Losses, claim or breach, including any claim by a third party, that might give rise to indemnification hereunder, and the Indemnified Party shall deliver to the Indemnifying Party a" Claim Certificate (*Id.*, § 9.5(a).) The Claim Certificate must state that "the Indemnified party has paid or properly accrued Losses, or reasonably anticipates that it may or will incur liability for Losses, for which such indemnified party is entitled to indemnification pursuant to this [APA]" and must specify "in reasonable detail … each individual item of Loss … the date (if any) such item was paid or properly accrued …." (*Id.*, § 9.5(a)(i), (ii).)

A party may object to a claim for indemnification. If that occurs,

> the Indemnifying Party shall deliver a written notice to such effect to the Indemnified Party within 30 days after receipt by the Indemnifying Party of such Claim Certificate. Thereafter, the Indemnifying Party and the Indemnified Party shall attempt in good faith to agree upon the rights of the respective parties within 30 days of receipt of such Claim Certificate with respect to each of such claims to which the Indemnifying Party has objected. … Should the Indemnified Party and the Indemnifying Party fail to agree as to any particular item or items or amount or amounts, then the Indemnified Party shall be entitled to pursue its available remedies for resolving its claim for indemnification.

(*Id.*, § 9.5(a).)

The parties agreed that disbursements could be made by joint or unilateral instructions. (Escrow Agreement, Art. I, § 1.3(a).)

> In the event the Escrow Agent receives Unilateral Instructions and a related Proof of Notice from the Buyer, the Escrow Agent shall pay the Escrow [Funds] to the account or accounts described in such Unilateral Instructions on the thirtieth day after receipt of such Unilateral Instructions, unless, before the thirtieth day after the date of receipt of such Unilateral Instructions, the Escrow Agent has received a Notice of Dispute and a related Proof of Notice from Misle. In the event the Escrow Agent receives such a Notice of Dispute, the Escrow Agent shall not pay the amount described in such Unilateral Instructions, but shall proceed as set forth in Section 3.5.

(*Id.*, § 1.3(c).)

### B. The Indemnification Claims Submitted by SSI.

In December 2014, SSI sent Misle a Claim Certificate and served Unilateral Instructions on Wells Fargo ("December Claim"). (Misle Decl., ¶ 12, Ex. E.) SSI sought indemnification under Section 9.2(f), because the City of San Jose determined that the CUP was not valid and determined that SSI would be required to obtain a new CUP. SSI stated that it would seek to recover any fees that it incurred in connection with obtaining the new CUP. (*Id.*, December Claim at 2-4.) SSI also asserted a claim for indemnification under Section 9.7 relating to SSI's excavation and disposal of soil that it asserted was contaminated. SSI sought recovery in the amount of $80,766.60 for that claim. (*Id.*, at 4-5.) SSI also sought indemnification in the amount of $5,838.00 for attorneys' fees and costs based on a claim relating to an underground storage tank. (*Id.*, at 6-7.) SSI served a set of Unilateral Instructions on Wells Fargo seeking distribution of $86,604.60 for the latter two claims. (*Id.*, at 8-9.) Misle attests, on information and belief, that his counsel objected to the December Claim "but inadvertently failed to send a Notice of Dispute to" Wells Fargo. (Misle Decl., ¶ 13.) It is undisputed that Wells Fargo distributed $86,604.60 to SSI.

On August 27, 2015, SSI sent a Claim Certificate to Misle and served Unilateral Instructions on Wells Fargo, which purported to update the December Claim relating to the CUP (the "August Claim"). SSI sought indemnification in the amount of $521,281.30 for losses it claims to have incurred to obtain a new CUP. (Misle Decl., ¶ 12, Ex. F (August Claim at 2-5).)

5

SSI also updated a claim from January 2014, which related to a writ of execution and notice of levy (the "writ and levy claim") that was served on Wells Fargo in connection with a judgment entered against AMI and other entities in *Nico Alloys, Inc. v. American Metal Group, Inc.*, Los Angeles Superior Court Case No. BC 466678 ("the *Nico Alloys* litigation").[4] (*Id.,* at 6.) SSI asserted that the *Nico Alloys* litigation constituted an "Excluded Liability" subject to indemnification under the APA, and it sought indemnification in the amount of $1,666.00 for attorneys' fees it incurred relating to the writ and levy. (*Id.*, at 6-7.) SSI also served Unilateral Instructions relating to these claims on Wells Fargo. (*Id.*, at 8-9.) Misle objected to and served a Notice of Dispute on SSI and Wells Fargo. (Dkt. No. 60-2, Declaration of Elizabeth M. Pappy ("Pappy Decl."), ¶ 4.)

On April 20, 2016, SSI sent a Claim Certificate to Misle and served Unilateral Instructions on Wells Fargo, in which it purported to update the December and August Claims ("April Claim").[5] (Misle Decl., ¶ 12, Ex. G.) SSI sought indemnification based on losses it anticipated it would incur as a result of the disputes over the December and August Claims, as well as the disputes raised in this litigation. SSI stated that it would seek disbursement "in an amount equal to the balance of the" Escrow Funds on April 21, 2016. (*Id.*, at 2-3.) Misle objected to and served a Notice of Dispute on SSI and Wells Fargo. (Pappy Decl., ¶ 5.)

**C.     The Claims for Relief in this Case.**

Misle asserts two claims for relief against SSI. In his claim for breach of contract, Misle alleges that SSI improperly sought funds to which it was not entitled when it submitted the December Claim. Misle also alleges that "[t]he CUP claim and the writ of execution attorney fees," submitted in the August Claim, "are not subject to indemnity rights under Section 9.7 of the

---

[4]     The plaintiffs in the *Nico Alloys* litigation ("Judgment Creditors") served the writ of execution and notice of levy on Wells Fargo in an effort to recover their judgment from the Escrow Funds. The efforts to recover that judgment resulted in further litigation, which has been related to this case. *See Wells Fargo Bank, N.A. v. American Metal Group, Inc.*, No. 16-cv-3614-JSW. That case is an interpleader action, filed by Wells Fargo against the Judgment Creditors, SSI, Misle, AMI, and Cornerstone Nevada, LLC.

[5]     Misle filed suit against SSI on December 23, 2015, and he has not amended his breach of contract claim to include the April Claim.

APA, and thus [are] unreimbursable from the escrow account. The demand on the escrow holder included [a] claim for attorney fees … regarding the soils claim and said expenses are not reimbursable pursuant to the APA under any circumstances." (Compl. ¶ 16.)

Misle's second claim seeks declaratory relief. Misle alleges that "indemnity claims set forth in the December Claim … and the August Claim … are without merit[.]" (Compl. ¶ 28.) He also alleges "Defendants were not entitled to take funds from the escrow account in January of 2015 and that the claims set forth in the August Claim … are not reimbursable from the escrow account[.]" (*Id.*) Misle seeks a "declaration as to his indemnification obligations under the APA and Defendants' rights to remove money from the escrow account based upon the August Claim[.]" (*Id.* ¶ 21.)[6]

SSI asserts counterclaims against Misle for, *inter alia*, breach of contract.[7] SSI alleges that Misle "breached the terms of the APA by filing a Notice of Objection in response to the August Claim … and April Claim …, which properly seek indemnification for losses to SSI relating to items covered under Section 9.2 and 9.7, as well as in related schedules from, among other sources, the Escrow Funds." (Counterclaim, ¶ 20.) SSI also alleges Misle "breached the terms of the APA by making an adverse claim to indemnification paid to SSI for losses it sustained and described [in] the December Claim…, which properly sought indemnification for losses to SSI relating to items covered under Section 9.2 and 9.7, as well as in related schedules from, among other sources, the Escrow Funds." (*Id.* ¶ 21.)

The Court will address additional facts as necessary in its analysis.

**ANALYSIS**

**A. Legal Standards Applicable to Motion for Summary Judgment.**

"A party may move for summary judgment, identifying each claim or defense … on which

---

[6] Misle also asserted a claim for conversion, but the Court granted SSI's motion for summary judgment on that claim. (Dkt. No. 76.)

[7] SSI also asserts counterclaims for equitable indemnification and for declaratory relief. In the latter claim, SSI asks the Court to declare that the December, August and April Claims are proper and that the Escrow Funds should be released to SSI.

7

summary judgment is sought." Fed. R. Civ. P. 56(a). A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment, or partial summary judgment, is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets its initial burden, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995). It is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Id.*; *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B.     Misle's Declaratory Relief Claim.**

**1.     General Principles of Contract Interpretation.**

"Interpretation of a contract is a matter of law," as is the determination of whether a contract is ambiguous. *Beck Park Apartments v. U.S. Dep't of Housing and Urban Development*, 695 F.2d 366, 369 (9th Cir. 1982); *see also Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004). "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation." *Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998). When the Court interprets a contract to determine the parties' intent, "'[t]he whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Lockyer v. R.J. Reynolds*, 107 Cal. App. 4th 516, 525 (2003).

The "clear and explicit meaning" of contractual provisions "interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation. If the meaning a layperson would ascribe to contract language is not ambiguous," the Court applies that meaning. *Santisas*, 17 Cal. 4th at 608. Contract language is ambiguous if it is reasonably susceptible to more than one meaning. *See, e.g., Curry v. Moody*, 40 Cal. App. 4th 1547, 1552 (1995).

In general, extrinsic evidence is not admissible to contradict or supplement the terms of a fully integrated contract; it may be used, however, to "to explain or interpret ambiguous language."[8] *See, e.g., Lonely Maiden Productions, LLC v. GoldenTree Asset Mgmt., LP*, 201 Cal. App. 4th 368, 376 (2011). If a party proffers extrinsic evidence of a contract's meaning, "'[t]he test of admissibility … is not whether [the contract] appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" *Wolf*, 114 Cal. App. 4th at 1356 (quoting *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 36

---

[8]     The APA contains an integration clause. (APA, Art. XII, § 12.3.)

1  (1968)).

"If, after considering the language of the contract and any admissible extrinsic evidence, the meaning of the contract is unambiguous, a court may properly interpret it on a motion for summary judgment. … However, if the interpretation turns upon the credibility of conflicting extrinsic evidence, or if construing the evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position, summary judgment is inappropriate." *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 990 (9th Cir. 2006) (internal quotations and citations omitted); *accord City of Hope Nat'l Med. Center v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008).

### 2. Interpretation of Section 4.2(c).

It is undisputed that Section 4.2(c) governs when funds in the Escrow Amount are to be distributed to Misle, and SSI does not contend the CUP claim and the writ and levy claim fall within the scope of the matters covered by Section 9.7. The primary dispute is whether indemnification claims that do not fall within Section 9.7 can be recovered from the Tranche III funds.[9] Misle argues they cannot, while SSI argues they can. Further, each party contends their position is supported by the clear and unambiguous terms of the APA. SSI argues, in the alternative, that if the Court finds that any portion of Section 4.2(c) is ambiguous, Misle's subsequent course of conduct, in connection with a settlement of earlier claims, demonstrates that its interpretation is consistent with the parties' intent. Misle argues that Section 4.2(c) clearly provides that the funds in Tranche I and Tranche II can only be used to indemnify matters covered in Section 9.2 and provides that the funds in Tranche III can only be used to indemnify matters covered in Section 9.7. SSI counters that Section 4.2(c) does not place any limits on how the funds in each tranche may be used.

The Court begins with the plain language of Section 4.2(c). The parties used the phrase

---

[9] In his opening brief, Misle simply addresses the standards by which a Court should determine if a party has stated a claim for declaratory relief. He does not address why his interpretation of the APA is correct. Standing alone, that argument would not be sufficient to sustain his burden as the moving party on this claim. However, Misle rectifies that deficiency through his argument on the breach of contract claims and the argument presented in his reply brief.

10

"will be used" to describe how the two portions of the Escrow Funds would be allocated. The parties did not define the word "will" in the APA; therefore the Court can consider dictionary definitions. *See, e.g., Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1195 (9th Cir. 2007). Misle argues the word "will" means "shall" not "may," *i.e.* it connotes mandatory language. (Reply Br. at 3:14-17 (quoting Black's Law Dictionary (6th ed.).) The current edition of Black's Law Dictionary defines "will" to mean "wish, desire, choice." Black's Law Dictionary at 1833 (10th ed. 2014). Other dictionaries define the word will to express "desire, choice, willingness, [or] consent" *and* to express "a command, exhortation, or injunction." *See, e.g.,* Webster's New Collegiate Dictionary, at 1331 (1979).

The parties did not modify the phrase "will be used" in Section 4.2(c) with some other expression of limitation such as "solely" or "only." However, they did use such language in other portions of the APA. For example, the parties agreed the "Escrow Amount," *i.e.* the aggregate $5.5 million, "*shall* serve as the *sole and exclusive source* of funding for any Losses indemnifiable under Sections 9.2(a) … except … with respect to matters relating to Fundamental Representations." (APA, Art. IX, § 9.4(b)(i).)[10] In contrast, the parties agreed that "the Excluded Liabilities and all items described on Schedule 9.2(f) shall be indemnifiable without limitation or threshold." (*Id.*, § 9.4(b)(iii).)[11] Although these provisions of the APA refer to the monetary caps the parties placed on indemnification liabilities, the language the parties used in Section 9.4(b)(i) demonstrates that they understood how to draft provisions that placed definite limitations on the Escrow Funds. The Court cannot conclude as a matter of law that the parties intended to use the terms "will" and "shall" interchangeably and, standing alone, Section 4.2(c) does not clearly and unambiguously "mandate" the type of claims that can be asserted against each tranche of funds.

---

[10] The parties capped other obligations at the amount of the Purchase Price. (APA, Art. IX, § 9.4(b)(ii).)

[11] SSI argues that Misle's interpretation "would entirely undermine the express language that recovery for Section 9.2 and 9.7 Losses shall be without limitation or threshold *from the Escrow Amount*." (Opp. Br. at 12:24-26 (emphasis added).) Contrary to SSI's argument, Section 9.4(b)(iii) does not include the emphasized language.

11

The parties agreed to divide the Escrow Funds into two portions of $4.5 and $1.0 million, and SSI did not offer any argument as to why the parties divided the Escrow Funds in this manner. "If possible, the [C]ourt should give effect to every provision" of the APA, and should avoid an interpretation that would render part of the APA surplusage." *National City Police Officers Ass'n v. City of National City*, 87 Cal. App. 4th 1274, 1279 (2001); *see also* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). Under SSI's interpretation of Section 4.2(c), the parties' decision to divide the Escrow Funds into two distinct portions would be nullified, which lends support to Misle's interpretation of the APA.

SSI relies on Section 9.4(e) to support its interpretation of Section 4.2(c). Section 9.4(e) states the "Escrow Amount shall be available to reimburse Buyer … for any Losses for which they are entitled to be indemnified pursuant to Section 9.2 or 9.7, against which Buyer may proceed at its discretion, as well as … pursue any other remedy otherwise available to Buyer." When the Court considers Section 9.4(e) in conjunction with Section 4.2(c), one plausible interpretation is that the parties agreed SSI could look beyond the Escrow Funds to obtain indemnification for any claims it does assert, unless the claim was subject to the cap set forth in Section 9.4(b)(i). This interpretation is consistent with the parties' agreement that the Escrow Funds are "to serve as *a source*" but not necessarily "*the* source" of indemnification for the matters addressed in Article IX. (APA Art. IV, § 4.2(c) (emphasis added).) Such an interpretation also would give meaning to the portions of the APA that provide that there are no monetary caps on "Excluded Liabilities" or on matters covered by Section 9.2(f).

However, the parties also agreed that the "Escrow Amount," *i.e.* the entire $5.5 million, "shall be available to reimburse" SSI "for any Losses for which [it is] entitled to be indemnified pursuant to Section 9.2 or 9.7[.]" (APA Art. IX, § 9.4(e).) Reading this language in conjunction with Section 4.2(c), it is equally plausible to interpret Section 4.2(c) to mean that there are no limitations on the type of claims that can be asserted against each tranche of funds.

The Court concludes that the terms of the APA are ambiguous as to whether the Tranche III funds

can be used to indemnify claims that do not fall within the scope of Section 9.7.[12]

Accordingly, the Court DENIES Misle's motion for summary judgment on the declaratory relief claim.

### C. Misle's Breach of Contract Claim and SSI's Counterclaim for Breach of Contract.

The essential elements a claim for breach of contract are: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to plaintiff. *Reichert v. General Insurance Co.*, 68 Cal. 2d 822, 830 (1969). The parties arguments focus on the third element, and in reviewing the remaining issues on Misle's motion, the Court concludes it must revisit its ruling on the litigation privilege. That conclusion is based on the fact that SSI clearly alleged that Misle breached the APA by submitting objections to its claims for indemnification and by filing this lawsuit, and the Court misconstrued the nature of SSI's claims when it issued its earlier ruling. (*See* Counterclaim ¶¶ 20-21; Dkt. No. 77, Order Denying in Part and Reserving Ruling in Part at 7:23-27.) Therefore, the Court VACATES that ruling.

Rather, the Court finds resolution of these claims resolves around the issue of whether either party can demonstrate a breach. The Court concludes they cannot, because neither SSI nor Misle has demonstrated that the only claims or objections that can be submitted under the procedures outlined in Section 9.5 are meritorious claims or objections. Therefore, setting aside whether either party ultimately be entitled to the remaining Escrow Funds, the Court concludes they cannot prevail on their breach of contract claims.

Accordingly, the Court DENIES Misle's motion for partial summary judgment on his breach of contract claim, and it GRANTS Misle's motion for summary judgment on SSI's

---

[12] SSI submitted a settlement agreement as extrinsic evidence of the parties' subsequent course of conduct to show that its interpretation of Section 4.2(c) is plausible. To the extent SSI argues that the parties' course of conduct shows its interpretation is the only reasonable interpretation, the Court is not persuaded. First, the fact that Misle may have been willing to settle a dispute about Section 9.7 claims using Tranche II funds, does not clearly demonstrate the parties' intent at the time they entered into the APA. Second, it is not clear that Misle did agree permit Tranche II funds to be used to indemnify claims covered by Section 9.7. The settlement agreement at issue states that $17,000 was to be paid from the Tranche III funds. (*See* Dkt. No. 64-1, Declaration of Thomas Woods, Ex. 1 at ECF p. 15.)

13

counterclaim for breach of contract.

**IT IS SO ORDERED.**

Dated: August 25, 2017

_____
JEFFREY S. WHITE
United States District Judge